## THE HALLFRIED.

(District Court, E. D. New York. July 22, 1921.)

1. **Salvage** ⬅️38—**Distribution of award for services to burning vessel.**

   A salvage award for services rendered to a steamship, which took fire while lying in a slip, distributed between the different vessels participating.

2. **Salvage** ⬅️10, 31—**Towing ship from slip near burning vessel held salvage service.**

   Services rendered to the steamship Halvorsen, worth with cargo about $2,160,000, in towing her from a slip when another vessel across the pier was burning, and she was in danger and requested help, *held* salvage services, and an award of $30,000, made therefor, to be divided between

different vessels contributing in proportion to the value of their respective services.

3. **Salvage ⊗⟲23—Carrier held not liable for salvage award against cargo.**

A railroad company, under a bill of lading providing that it should be liable only as warehouseman for loss or damage by fire to the goods after 48 hours from the time it gave notice of their arrival at destination, where by direction of the consignee and as provided in the bill it transported the goods by lighter to a steamship and gave notice of their arrival, *held* not liable for a salvage award made against the cargo for services rendered in saving the lighter and cargo from danger from fire ten days after such notice.

In Admiralty. Suit by the John E. Moore Company and others against the Steamship Hallfried, with other suits for salvage service. Decree awarding and distributing salvage.

Herbert Green, of New York City (Leo J. Curren, of New York City of counsel), for libelant.

Haight, Sanford, Smith & Griffin, of New York City, for claimant.

GARVIN, District Judge. [1] A number of actions have been tried together, some for services rendered to the steamship Hallfried and others in connection with the steamship Halvorsen and three smaller vessels. The rendition of salvage services to the Hallfried is admitted, and by the agreement of the parties their value has been fixed; the only matter before the court, therefore, so far as that vessel is concerned, being the question of distribution. In each action against the Halvorsen and the smaller vessels there is a denial that services of a salvage character were rendered.

On April 19, 1920, the Norwegian steamship Hallfried was moored on the north side of Pier 5, Bush Docks, Brooklyn, at about the middle berth of the pier, lying bow in. There was a strong northwest wind blowing toward the shore. Shortly after noon, at about 12:50 p. m., a serious fire broke out in her forward hold. Her cargo was inflammable and of an explosive character. The officials of the fire department, who arrived shortly, considered the fire dangerous and soon sent in four alarms, which is unusual. Conditions became so serious that the fire chief in charge ordered all off the Hallfried. Almost immediately thereafter a series of heavy explosions occurred. The chief then ordered the Hallfried taken out into the river. At this juncture the steam tug Erickson came into the slip, and those in charge, at what seems to have been considerable danger, made fast to the Hallfried and started to pull her out of the slip. The fire was raging fiercely and burning débris was being thrown in all directions by the explosions. After a short time the tug Leonard Richards came to the assistance of the Erickson with the Hallfried in tow, and these two tugs started out of the slip with the Hallfried in tow. Capt. Fort, the captain of the Erickson, went aboard the burning vessel and took charge. His position was one of great peril. As the steamer was towed out of the slip, one of the explosions loosened the anchor catch, so that the anchor went overboard when she was about opposite the end of the piers. Without these two tugs the Hallfried would probably have been lost. They undertook her

rescue at great risk to themselves, and should have a substantial share of the award. It may not be too much to direct that these tugs receive one-half the award, as requested by their owners; but I am of the opinion that, as valuable services were rendered by other boats, to which I shall presently refer, it will be a sufficient proportion of the entire award to allow 40 per cent. thereof to the Erickson and to the Richards. Of this amount, after deducting a special award of $1,000 to Capt. Fort, the Erickson will receive three-fifths and the Richards two-fifths—this because the Erickson was the first to respond, and was working some time, alone, before the Richards arrived.

When the anchor of the Hallfried went overboard, a new danger developed. The tide was apt to swing her around against one of the piers. If this occurred and the pier took fire, there was great danger that the boat would be a total loss. A number of other craft assisted in holding her up against the tide. They all performed services of merit, and in some cases it is difficult to differentiate the value of what they did. These vessels are the tug Campbell and Stewart, the Thomas Flannery, the Reichert Brothers, the James McDonough, the William Flannery, the Harold Richert, the Carroll, the Richmond, the steam lighter W. J. Gillen, the W. F. Dalzell, the Edward G. Dalzell, the J. Fred Lohman, the Phil. J. Miller, the Charles A. Fox, the Edwin M. Millard, the Champion, the Commissioner, the Relief, and the Gustav Ackerman. Of these vessels, the Edwin M. Millard arrived very shortly after the Hallfried had been pulled out opposite the end of the pier, and for some time helped the Erickson and the Richards prevent the ship's stern from sagging down, and up against the end of the pier. This was a very valuable service, was accompanied by danger, and should receive recognition. The photographs in evidence make it clear that the Millard was for some time the only boat performing this particular work. Except for the Champion, the Commissioner, and the Relief, each of the vessels mentioned (whose participation has not been specifically described) assisted in the work of holding up the Hallfried against the tide, or threw water on her as she lay at the entrance to the slip. Their services were not all of equal value, nor were they of exactly the same character, but all were standing by, and each participated in the work of putting out the fire and keeping the boat from the piers. The work of no one of these vessels stands out with any prominence, and they should each receive the same share of the award.

After the Hallfried had been lying for what seems to have been about half an hour, held by her anchor as indicated, two boats owned by the Merritt & Chapman Derrick & Wrecking Company arrived on the scene—the tug Relief and the wrecking steamer Champion. The latter is a powerful, well-equipped wrecking steamer. Both boats set to work to throw water on the flames, which were still pouring out of the forward part of the vessel. A thick smoke made the work more difficult. These two boats not only rendered valuable service to the Hallfried in getting the fire under control, at considerable risk to themselves, but one of them, the Champion, was the boat to release the anchor of the Hallfried, being apparently the only vessel equipped to do this. As a result it was possible to tow her to a place of safety—

the flats opposite, where she could rest on the bottom. If she had not been towed from the entrance to the pier, she would have sunk there, as one of her seacocks was open and she was settling in the water. The Champion should receive 25 per cent. and the Relief 5 per cent. of the total award. The wrecking steamship Commissioner arrived after the Hallfried had been beached on the flats, and stood by all night to see that she did not drift off into deep water and sink. The Commissioner suffered some damage, not considerable, to her equipment. She was at no time in any danger whatever. She is entitled to receive 2 per cent. of the award. The libel filed by Merritt & Chapman Company claimed for services rendered to the Hallfried by the Caddie and the Consul, but they did nothing. The balance of the award should be divided equally among the other vessels which have been mentioned. The sum awarded to each of the boats participating in these operations will be divided, three-fourths to the vessel and one-fourth to the members of the crew in the proportion of their respective monthly wages.

[2] The steamship Halvorsen, with her cargo, worth about $2,160,-000, was moored on the south side of the same pier, opposite the Hallfried, perhaps somewhat further out. She signaled for help and requested to be towed to a place of safety. The boats which responded and came to her assistance were the tug Nonpariel, the tug Richmond, the steam lighter W. J. Gillen, and the steam tugs Robert Palmer, Barton Bros., and John Nichols, and they all assisted in towing her to a safe anchorage out into the river. Only a short time was required, hardly half an hour. Whether or not the Halvorsen would have been destroyed, if she had not been moved, it is clearly established that her position was considered by all exceedingly dangerous. Deputy Chief Langon testified that, if he had had her in charge, he would possibly have moved her. This, I take it, means that he considered her safety threatened, and inasmuch as at least one of the rescuing boats—i. e., the Nonpariel—was placed in some danger, there has been established the basis of an action for salvage services.

I am of the opinion that the award in this case should be substantially less than in the case of the Westmount, in which $85,000 was allowed. Nor are the services of equal value to the services rendered to the Hallfried. The Westmount lay just astern of the Hallfried—i. e., toward the river, at the same pier—and the Hallfried could not be moved until the Westmount was first taken out of the slip. If the latter had been left at the pier, the Hallfried would in all probability have been a total loss, the pier would have taken fire, and the conflagration would have spread to and destroyed all the vessels in immediate proximity, including the Westmount. Thus the removal of the latter was imperative to prevent a great disaster. The peril of the Halvorsen was by no means as great as that of the Hallfried. She was not on fire at any time. However, burning débris was falling on and about her, a number of smaller craft, lying near, had inflammable cargoes, and there was danger that the fire would spread directly to the Halvorsen across the wooden pier which separated her from the Hallfried.

The sum of $30,000 will be awarded as salvage, and an additional

sum to Capt. Deakin, as herein specified. The Nonpariel arrived first on the scene, and towed the Halvorsen for some distance before the other vessels arrived. She should therefore receive 50 per cent. of the $30,000; the other assisting boats each to receive an equal share of the remainder. When the Nonpariel first came up to the Halvorsen, Capt. Deakin, of the Nonpariel, was requested by the second officer of the Halvorsen to come aboard, take her in charge, and direct the work of towing her out of the slip. He did so, and as he assumed the responsibility of directing the operation and performed the task with great skill, he will be awarded an additional sum, one-half of the amount found due him when the award is divided. The awards to the rescuing vessels will be divided, three-fourths to the vessels and one-fourth to the crew, which will be divided among them proportionately to their respective monthly wages.

To the Halvorsen were moored three barges, the Central Railroad of New Jersey No. 206, the Liberty No. 26, and the Dauntless. The value of these and their cargoes has been stipulated, except the value of the hull of the Dauntless, which is hereby found to be $500. It has been further stipulated that the amounts to be awarded against these vessels and cargoes shall be in the same ratio as the award made by the court in the case against the Halvorsen. The values upon which the awards will be based are as follows:

Liberty No. 26:
```
    Hull by stipulation......................................  $ 9,000.00
    Cargo by stipulation.....................................   16,473.36
                                                               ----------
    Total ...................................................  $25,473.36
```
Central Railroad of New Jersey No. 206:
```
    Hull by stipulation .....................................  $ 5,000.00
    Cargo by stipulation.....................................    9,725.00
                                                               ----------
    Total ...................................................  $14,725.00
```
Dauntless:
```
    Hull as found by court...................................  $   500.00
    Cargo by stipulation.....................................   22,455.17
                                                               ----------
    Total ...................................................  $22,955.17
```

[3] But a single question remains to be determined. The Central Railroad of New Jersey is before the court as claimant of the lighter C. R. R. No. 206 in the action brought against it for salvage, and as respondent, brought in by petition by the claimant of the Halvorsen and by the owners of the cargo of the lighter 206 to pay an award that may be made against the cargo for salvage. The liability of the Central Railroad arises because of its having issued its bill of lading, which provides:

"For loss, damage, or delay caused by fire occurring after 48 hours (exclusive of legal holidays), after notice of the arrival of the property at destination or at port of export, (if intended for export) has been duly sent or given, *the carrier's liability shall be that of warehouseman only.*"

And in section 3:

"Every carrier shall have the right in case of physical necessity to forward said property by any railroad or route between the point of shipment and the

point of destination; but, if such diversion shall be from rail to a water route, the liability of the carrier shall be the same as though the entire carriage were by rail."

The consignee directed that the goods be delivered to the steamship Halvorsen at Pier 5 on or before April 12. The lighter arrived on April 9 and reported to the receiving clerk. The salvage services were rendered April 19, ten days after notice of the arrival of the property at destination. The liability of the Railroad Company was therefore that of the warehouseman only; i. e., for negligence. There was no negligence, and the petition must·be dismissed in each case. Other reasons are urged for the dismissal of the petition, but in view of the conclusion just reached they need not be considered.

In view of the various interests involved, the decrees to be entered upon this decision may be presented at one time for settlement. All counsel may appear before me on July 29, 1921, at 10:30 a. m.